**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------- X
                                   :
PAUL ORFALEA,                      :
                                   :
              Plaintiff,           :
                                   :
         v.                        :    07 Civ. 2256 (BSJ)(GWG)
                                   :    **Opinion & Order**
CLAYTON, DUBILIER & RICE, INC., and :
CLAYTON, DUBILIER & RICE FUND VI,  :
                                   :
              Defendants.          :
                                   :
----------------------------------X

**BARBARA S. JONES**
**UNITED STATES DISTRICT JUDGE**

On March 16, 2007 Plaintiff Paul Orfalea ("Orfalea" or

"Plaintiff") filed suit against Defendants Clayton, Dubilier &

Rice, Inc. ("CD&R, Inc.") and Clayton, Dubilier & Rice Fund VI

("CD&R Fund VI")(collectively "Defendants") alleging claims

arising out of a stock purchase agreement executed in October

2002.  Defendants now move for summary judgment.  For the

reasons set forth below, Defendants' Motion for Summary Judgment

is GRANTED.

## BACKGROUND[1]

This case arises out of a stock purchase agreement executed

between Orfalea and CD&R Fund VI on October 8, 2002.  Plaintiff

Orfalea is the founder and a former shareholder in Kinko's, Inc.

(Movant's Rule 56.1 Stmt. ¶ 1; Pl.'s Rule 56.1 Stmt. ¶ 1.)

Defendant Clayton, Dubilier & Rice, Inc. is a private equity

---

[1] The facts are undisputed.

1

firm that manages investments of corporate and institutional

investors through several investment funds, including Defendant

Clayton, Dubilier & Rice Fund VI. (Movant's Rule 56.1 Stmt. ¶ 2;

Pl.'s Rule 56.1 Stmt. ¶ 2.)

On October 8, 2002, Orfalea and Defendants executed a stock

purchase agreement, pursuant to which Orfalea agreed to sell all

his remaining shares of common stock in Kinko's to Defendants.

(Movant's Rule 56.1 Stmt. ¶ 4; Pl.'s Rule 56.1 Stmt. ¶ 4.)  The

agreement formally closed on December 20, 2002.  (Movant's Rule

56.1 Stmt. ¶ 5; Pl.'s Rule 56.1 Stmt. ¶ 5.)  At closing, based

on the $15.00 per share purchase price specified in the

agreement, Orfalea was paid just over $95 million for his

shares.  (Movant's Rule 56.1 Stmt. ¶ 6; Pl.'s Rule 56.1 Stmt. ¶

6.)

Section 7(a) of the stock purchase agreement, titled

"Subsequent Share Transactions," is a "make-whole" provision

that restricts transactions involving Kinko's stock for nine

months following the closing date.  In its entirety, Section

7(a) provides:

> "If, after the date of this Agreement and prior to the nine
> month anniversary of the Closing Date, the CD&R Group (as
> defined below) acquires or sells, or enters into an
> agreement with respect to the acquisition or sale of, any
> shares of Common Stock or any other Equity Securities (as
> defined below)(a "Subsequent Transaction"), and the average
> purchase price for such additional shares of Common Stock
> (or the average exercise or conversion price per share of
> Common Stock under such other Equity Securities) acquired

or sold by the CD&R Group (the "Subsequent Purchase Price")
from any single seller or purchaser is greater than $15.00
per share of Common Stock, upon the consummation of the
Subsequent Transaction each Investor shall deliver to
Seller by wire transfer of immediately available funds to
an account or accounts previously designated by Seller, an
amount equal to the product of (i) the Subsequent Purchase
Price less $15.00 and (ii) the number of Shares purchased
by such Investor pursuant to this Agreement; provided that,
notwithstanding the foregoing, if such Subsequent
Transaction shall occur prior to the Closing Date, the
payments by such Investor of the foregoing amount pursuant
to this Section 7(a) shall be made on and subject to the
Closing.  As used herein "CD&R Group" means, collectively
Fund VI and its Affiliates other than Kinko's and its
Subsidiaries (including, without limitation, each other
purchaser or seller of Equity Securities if and to the
extent the purchase price for such purchase is derived from
or received by an investment fund managed, directly or
indirectly by Clayton, Dubilier & Rice, Inc.).  As used
herein, "Equity Securities" means the Common Stock and any
securities exercisable or exchangeable for, or convertible
into, Common Stock.  Fund VI shall act in good faith to
give effect to the spirit of the protections afforded to
Seller pursuant to this Section 7(a) through the nine month
anniversary of the Closing Date and, consistent therewith,
shall not (and shall cause each member of the CD&R Group
not to) initiate any transaction designed to circumvent the
foregoing, including, but not limited to, providing
financing or credit support for third party purchases of
Equity Securities (other than employee repurchases or
repurchases under the Kinko's Inc. 401(k) Retirement
Savings Plan (the "Kinko's 401(k) Plan") permitted under
Section 7(b)) which, if consummated by Fund VI, would
require Fund VI to make the payment to Seller contemplated
by the first sentence of this Section 7(a)."  (Movant's
Rule 56.1 Stmt. ¶ 8; Pl.'s Rule 56.1 Stmt. ¶ 8.)

The "nine month anniversary of the Closing Date" occurred

on September 20, 2003.  (Movant's Rule 56.1 Stmt. ¶ 9; Pl.'s

Rule 56.1 Stmt. ¶ 9.)

During the summer of 2003, Defendants began considering the

sale of its interest in Kinko's.  On May 23, Gary Kusin, CEO of

Kinko's, sent a memorandum to CD&R, Inc. partner George Tamke suggesting that Defendants investigate selling Kinko's and identifying several potential buyers such as Staples, Office Depot, and FedEx. (Movant's Rule 56.1 Stmt. ¶ 27; Pl.'s Rule 56.1 Stmt. ¶ 27.) Three days later, CD&R, Inc. partner David Wasserman instructed Stephen Shapiro, a CD&R, Inc. associate, to put together a list of potential buyers for Kinko's, suggesting Pitney Bowes, FedEx, and several additional companies. (Movant's Rule 56.1 Stmt. ¶ 28; Pl.'s Rule 56.1 Stmt. ¶ 28.)

In August, Defendants began discussions with Pitney Bowes regarding the acquisition of Kinko's. (Movant's Rule 56.1 Stmt. ¶ 30; Pl.'s Rule 56.1 Stmt. ¶ 30.) In September, Defendants provided Pitney Bowes with confidential financial information and told Pitney Bowes that Kinko's had "an equity value of approximately $38 per share." (Movant's Rule 56.1 Stmt. ¶ 31; Pl.'s Rule 56.1 Stmt. ¶ 31.) By November, discussions with Pitney Bowes broke down as Pitney Bowes was only willing to pay approximately $31 per share. (Movant's Rule 56.1 Stmt. ¶ 32; Pl.'s Rule 56.1 Stmt. ¶ 32.)

On November 12, 2003, FedEx Corporation ("Fed Ex") contacted Defendants regarding a possible acquisition of Kinko's. (Movant's Rule 56.1 Stmt. ¶ 11; Pl.'s Rule 56.1 Stmt. ¶ 11.) This was the first instance where FedEx and Defendants discussed the matter. (Movant's Rule 56.1 Stmt. ¶ 13; Pl.'s

4

Rule 56.1 Stmt. ¶ 13.)  On November 24, members of senior management from Kinko's and FedEx met to review summary financial and other information.  (Movant's Rule 56.1 Stmt. ¶ 16; Pl.'s Rule 56.1 Stmt. ¶ 16.)  Between December 11 and 29, FedEx conducted a due diligence investigation of Kinko's, and representatives from FedEx, Kinko's, and the principal stockholders in Kinko's (including CD&R Fund VI) negotiated the terms of a definitive merger agreement.  (Movant's Rule 56.1 Stmt. ¶ 18; Pl.'s Rule 56.1 Stmt. ¶ 18.)  On December 29, FedEx, Kinko's, and the principal stockholders executed an "Agreement and Plan of Merger."  (Movant's Rule 56.1 Stmt. ¶ 19; Pl.'s Rule 56.1 Stmt. ¶ 19.)  FedEx's acquisition of Kinko's closed on February 12, 2004.  (Movant's Rule 56.1 Stmt. ¶ 22; Pl.'s Rule 56.1 Stmt. ¶ 22.)  The aggregate merger consideration of $2.4 billion reflected a purchase price of approximately $37 per share.  (Movant's Rule 56.1 Stmt. ¶ 23; Pl.'s Rule 56.1 Stmt. ¶ 23.)

## LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides that a court shall grant a motion for summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any

material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish her right to judgment as a matter of law." Rodriguez v. City of New York, 72 F.3d 1051, 1060-61 (2d Cir. 1995). The substantive law governing the case will identify those facts that are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In determining whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 37 (2d Cir. 1994).

### DISCUSSION

Defendants argue that summary judgment is appropriate on plaintiff's breach of contract claims because, based on the undisputed facts, there was no breach. The Court agrees.

In determining a motion for summary judgment involving the construction of contractual language, a court should accord that language its plain meaning giving due consideration to the surrounding circumstances and apparent purpose which the parties sought to accomplish. Thompson v. Gjivoje, 896 F.2d 716, 721 (2d Cir. 1990); Cable Science Corp. v. Rochdale Village, Inc., 920 F.2d 147, 151 (2d Cir. 1990). When the language of a contract is susceptible to different interpretations and where there is relevant extrinsic evidence of the parties' actual intent, then the contract's meaning becomes an issue of fact precluding summary judgment. Lucente v. IBM, 310 F.3d 243, 257 (2d Cir. 2002). However, "where the language of the contract is unambiguous, and reasonable persons could not differ as to its meaning, the question of interpretation is one of law to be answered by the court." Rothenberg v. Lincoln Farm Camp, Inc., 755 F.2d 1017, 1019 (2d Cir. 1985); see also Hunt, Ltd. v. Lifschultz Fast Freight, Inc., 889 F.2d 1274, 1277 (2d Cir. 1989); Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc., 232 F.3d 153, 157-158 (2d Cir. 2000); JA Apparel Corp. v. Abboud, 568 F.3d 390, 396 (2d Cir. 2009).

The first sentence of Section 7(a) of the stock purchase agreement clearly states that the "make-whole" clause requiring payment to Orfalea is triggered if CD&R, Inc. or CD&R Fund VI

"acquires or sells, or enters into an agreement with respect to the acquisition or sale of, any shares of Common Stock or any other Equity Securities… and the average purchase price for such additional shares of Common Stock… acquired or sold by CD&R is greater than $15.00 per share of Common Stock" within nine months of the agreement closing date.  The nine month period ended on September 20, 2003.  Plaintiff does not allege any breach of this portion of the agreement by Defendants.

The issue before this Court is the proper interpretation of the final sentence of Section 7(a) of the stock purchase agreement.  The final sentence provides that Defendants "shall act in good faith to give effect to the spirit of the protections afforded to (Orfalea)" and shall not "initiate any transaction designed to circumvent the foregoing, including, but not limited to, providing financing or credit support for third party purchases of Equity Securities. . . which, if consummated by Fund VI, would require Fund VI to make the payment to Seller contemplated by the first sentence of Section 7(a)."

Defendants appear to argue that the final sentence of Section 7(a) solely "reflects a commitment to 'act in good faith to give effect to the spirit of the protections' afforded by the make-whole payment obligation. . . ."  (Pl.'s Reply Mem. 6.) Thus, "the payment obligation arises only if there was a sale or agreement to sell within the nine-month period."  (Pl.'s Mem.

8

12.)  The Court disagrees because this interpretation would render the final sentence of Section 7(a) superfluous and meaningless.  See LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp., 424 F.3d 195, 206 (2d Cir. 2005) ("An interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible."); India.com, Inc. v. Dalal, 412 F.3d 315, 323 (2d Cir. 2005) ("Effect and meaning must be given to every term of the contract, and reasonable effort must be made to harmonize all of its terms.")[2]

The Court finds that Plaintiff's interpretation of the final sentence of Section 7(a) is in accord with its plain meaning.  As Plaintiff states, "The clear intent of this provision is to prevent CD&R from initiating a transaction that would require a payment if it were consummated within the nine-month period, but then circumventing the payment obligation by delaying consummation until after the nine-month period" (Pl.'s Resp. Mem. 6).  However, even under this interpretation of Section 7(a), based on the undisputed facts of the case, it is clear that Defendants did not breach the agreement.

---

[2] Under New York law, every contract has an implied covenant of good faith and fair dealing.  Schwartz v. Liberty Mut. Ins. Co., 539 F.3d 135, 141 (2d Cir. 2008) ("There is an implied covenant of good faith and fair dealing in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement.")

Plaintiff claims that Defendants "initiated a strategy to sell Kinko's to one of the buyers on its 'Potential Buyer's List' in May 2003. Federal Express was one of the buyers on the list." (Pl.'s Resp. Mem. 8.)  However, Defendants' internal discussions of potential future transactions were not an initiation of "a transaction designed to circumvent" the agreement.  Restricting such conduct stretches beyond the clear meaning of the final sentence of Section 7(a) and places an undue burden on the Defendants.  "If a contract is clear, courts must take care not to alter or go beyond the express terms of the agreement, or to impose obligations on the parties that are not mandated by the unambiguous terms of the agreement itself." Red Ball Interior Demolition Corp. v. Palmadessa, 173 F.3d 481, 484 (2d Cir. 1999).

Plaintiff also claims that because an agreement was reached between Defendants and FedEx shortly after the Pitney Bowes negotiations broke down, "a jury could reasonably find that CD&R, within the nine months after the Closing Date of the Stock Purchase Agreement, initiated the transaction." (Pl.'s Resp. Mem. 8.)  However, aside from mention of FedEx as a potential buyer in internal discussions, Plaintiff offers no evidence that Defendants initiated a transaction with FedEx prior to September 20, 2003.  "To defeat summary judgment… nonmoving parties must do more than simply show that there is some metaphysical doubt

10

as to the material facts and they may not rely on conclusory
allegations or unsubstantiated speculation." Jeffreys v. City
of New York, 426 F.3d 549, 554 (2d Cir. 2005).

Accordingly, the Court finds based on the undisputed facts
that Defendants' actions do not amount to a breach of contract.
Plaintiff's claims for both money damages and rescission are
DISMISSED.

## CONCLUSION

For the reasons set forth above, Defendants' motion for
summary judgment is GRANTED.  Because no further issues remain
in this litigation, the Clerk of the Court is directed to close
the case.

**SO ORDERED:**

**Barbara S. Jones**
**UNITED STATES DISTRICT JUDGE**

Dated:    New York, New York
          September 30, 2009

11